KOLOA SUGAR COMPANY *v.* WILLIAM BROWN and
LUUKIA NAKAPAHU.

EXCEPTIONS FROM THE CIRCUIT COURT, FIFTH CIRCUIT.

SUBMITTED JUNE 20, 1899.            DECIDED AUGUST 14, 1899.

JUDD, C.J., FREAR AND WHITING, JJ.

A verdict in ejectment held contrary to the law and the evidence.

Adverse possession does not begin to run in favor of one holding under
   a tenant, even under an attempted transfer in fee from the tenant,
   until at least notice of the adverse nature of the occupant's claim
   is brought clearly to the attention of the landlord.

Judgment *non obstante veredicto* may be awarded under our practice on
   the evidence as well as on the pleadings, but not where the facts
   are contested.

OPINION OF THE COURT BY FREAR, J.

This is an action of ejectment for a piece of land containing
2.9 acres at Koloa, Kauai. The case comes here on plaintiff's
exceptions, the only one of which that need be considered being
that taken to the verdict as contrary to the law and the evidence.

The plaintiff made out a prima facie good paper title, claim-
ing this piece of land as a part of the Ahupuaa of Koloa con-
veyed by Lot Kamehameha to R. C. Wyllie in 1863, by the
executors of the latter to I. Richardson in 1868, by Richardson
to Mrs. A. H. Knudsen in 1872 and leased by Mrs. Knudsen to
the plaintiff for 25 years in 1890.

The defendants then set up an oral gift and adverse possession,
claiming that in 1862 a former occupant of the land, one Hannah
Moore, gave it to one Nakapahu, who thereupon took possession

and thenceforth claimed the land as his own until his death in 1894, and that it then descended to his daughter the defendant Luukia who had previously lived on the land with her father and has lived on it since then to the present time. The other defendant, Wm. Brown, is Luukia's husband.

The plaintiff by way of rebuttal then attempted to show that Nakapahu took possession by permission of one holding under a tenant of the owner and that therefore, as standing in the shoes of the tenant, he could not deny the landlord's title or claim an adverse possession until at least notice thereof was brought to the attention of the landlord and that the landlord had received no such notice.

The court appears to have instructed the jury clearly as to the law that adverse possession could not begin to run under such circumstances until such notice, and the question is whether the evidence was such as could support a finding either that the possession did not begin in that way or that such notice was given at least twenty years before the commencement of this action. Let us consider the latter question first.

It appears that in 1862 and prior thereto one Mika and his aunt, Hannah Moore, and some other relatives lived on a tract of land containing about seven acres of which the land in dispute is a part. In 1862 a sister to the defendant Luukia was born. Hannah Moore adopted her and either as a consideration therefor or in order to have the child near by, she asked Nakapahu the father to come and live on the land in question. He with his family who were living at a different place in Koloa then moved to this land and lived with Mika, Hannah Moore and the others until with the assistance of Mika and others he built a house on the part of the land now in dispute and a wall around it. He then, in 1863, moved on to this part of the land and continued there cultivating it until his death in 1894, since which time his daughter the defendant Luukia has lived there. In 1891 or 1892 the manager of the plaintiff corporation went to Nakapahu's house and demanded $50 rent, as the defendants' witnesses testified, for this land, but, as the manager testified,

for another piece of land, and Nakapahu told him, according to defendants' witnesses, to go away and that the land was his, but, according to the manager, that the rent was too high and he could not pay it. The testimony of defendants' witnesses as to what Nakapahu said to the plaintiff's manager to the effect that this was his land, was stricken out by order of the court, on motion of plaintiff's counsel, erroneously, as we believe. In fact Nakapahu never paid any rent for this piece of land. There is some testimony, of little or no consequence, to the effect that he never paid any taxes on the land but that the taxes were paid by the plaintiff on this piece as part of its land which was listed as a whole. About three years before the trial of this case the defendant Brown who then lived on this land, though not married to Luukia until after the commencement of this action, sued the plaintiff for injury to his taro due as he claimed to a scarcity of water brought about by the action of the plaintiff in a season of drought, and the plaintiff paid him $200. Brown made no claim to the land itself. The plaintiff claims that Brown had influence with the natives and was stirring them up against it and that the $200 was paid to buy him off and not because he had any rights and that upon payment of the money the natives quieted down. A month or two before this case was tried Brown brought another action against the plaintiff and then the plaintiff brought the present action. Practically no other evidence was introduced to show adverse possession. It thus appears that whatever may be said of the circumstances since 1891 there was nothing prior to that time to show to the owner of the land that Nakapahu's possession, if originally permissive, had become adverse. His acts before 1891 are referable to the original permissive possession, if there was one. This brings us to the other question whether the possession was originally permissive, that is, under the owner of the land.

As already stated Mika and his relatives were living on this land in 1862 and previously. In 1861 one Charman obtained a lease of this and other land from the then owner Prince Lot Kamehameha. This lease was cancelled in 1869 in consequence

of the giving of a new lease in that year to expire in 1896 of the same and other lands to the same lessee by the then owner Ira Richardson.   Mika owned another piece of land in Koloa of nearly the same area as this.   When Charman obtained his lease of this land, Mika, who apparently had lived there many years but had failed to obtain a kuleana award for the land, preferring this land which had water to his own which was kula or dry land, agreed, as he testified, with Charman to "swap" the land occupied by him but leased to Charman for the other land owned by him, for the term of Charman's lease, and, after this swap had been effected, upon the request of his aunt, Hannah Moore, as he testified, he consented to Nakapahu's living on the land.   In 1896, as Mika and plaintiff's manager testified, Mika informed the manager that the lease was about to expire and the swap to terminate and it was agreed to swap back.   Mika then leased his own piece to one Rego and afterwards sold it to the plaintiff subject to the lease.   Mika testified that Nakapahu once asked him for a deed of the land in question but that he replied that he could not give one because the land would go back to the owner when the swap was up.   M. D. Monsarrat, a surveyor, testified that when he surveyed this land in 1896, upon saying to the people there that the land was not a kuleana, they replied that it was swap land, that it was swapped for a piece of Mika's. Kahuakau testified that in 1891, at a meeting of a native hui, Mika spoke of the expiration of the hui lease (apparently the Charman lease) in about five years and the termination of the swap with Charman, and that Nakapahu then said that when that swap was up between Mika and Charman he was going to live at Mahaulepu.   There is no evidence controverting this line of testimony.   Thus it is clear that Nakapahu held under Mika and the latter under Charman who held under a lease from the owner.

It is urged that the jury did not believe Mika.   But there is nothing to show that his testimony was discredited and it is supported by the testimony of others and by undisputed documents and acts.   It was claimed by the defendants that the land

was given (orally) to Nakapahu as his own, but it does not appear clearly what was meant by the witnesses who testified on this point, and as matter of law even if those holding as tenants under the owner had meant to give him the land in fee and even if he were ignorant of the character of their possession or title, still, if they in fact occupied the position of tenants, he could not show adverse possession until he had at least brought his claim clearly to the notice of the owner. See *Whiting v. Edmunds*, 94 N. Y. 309; 1 Am. & Eng. Enc. 2d Ed. 810; *Dowsett v. Maukeala*, 10 Haw. 166.

In this court plaintiff's counsel moved for judgment *non obstante veredicto*. It is the practice here to order such judgments in proper cases on the evidence as well as on the pleadings, but not on disputed facts and therefore we cannot grant the motion. Defendants' evidence does not show a confession of the truth of the testimony for the plaintiff and an attempted but unsuccessful avoidance of its effect. Defendants contest the truth itself of the testimony of the plaintiff's witnesses.

The exceptions are sustained and a new trial is granted.

*M. F. Prosser* and *F. M. Hatch* for the plaintiff.

*T. McCants Stewart* for the defendants.